UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL HEALTH, et al.,<br><br>          Plaintiffs,<br><br>     vs.<br><br>ANDREW WHEELER, in his official capacity as Acting Administrator of the U.S. Environmental Protection Agency, et al.,<br><br>          Defendants. | Case No:  C 18-03197 SBA<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Dkt. 51 |

Plaintiffs Center for Environmental Health, Center for Biological Diversity, and Californians for Pesticide Reform (collectively, "Plaintiffs") bring the instant action against the United States Environmental Protection Agency ("EPA"); Andrew Wheeler, in his capacity as the Administrator of the EPA; the United States Fish & Wildlife Service ("FWS"); and Ryan Zinke, in his capacity as the Secretary of the Department of Interior (collectively, "Defendants").  Plaintiffs allege that, in violation of the Endangered Species Act and the Administrative Procedure Act, Defendants have failed to complete the requisite interagency consultation to ensure that certain pesticide products containing malathion do not jeopardize endangered or threatened species.  CropLife America, a trade association that represents the common interests of pesticide manufacturers, has intervened as a defendant ("CropLife" or "Intervenor-Defendant").

The matter is presently before the Court on Defendants' Motion to Dismiss Second Amended Complaint, Dkt. 51, and Intervenor-Defendant's joinder therein, Dkt. 52. Having read and considered the papers filed in connection with this matter and being fully informed, the Court DENIES the motion to dismiss, for the reasons stated below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I. BACKGROUND

## A. STATUTORY AND REGULATORY FRAMEWORK

### 1. The Federal Insecticide, Fungicide, and Rodenticide Act

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") charges the EPA with the oversight of chemicals used as pesticides. 7 U.S.C. § 136 et seq. Pursuant to FIFRA, pesticides may not be distributed or sold in the United States unless registered with the EPA. Id. § 136a(a). This registration requirement applies to pesticide products and active ingredients used to manufacture pesticide products. Id.; 40 C.R.F. § 152.15.

As part of the registration process, "the EPA conducts an analysis that considers the 'economic, social and environmental costs and benefits of the use of any pesticide.'" Ctr. for Biological Diversity v. EPA, 847 F.3d 1075, 1085 (9th Cir. 2017) (citations omitted). In conducting that analysis, the EPA determines whether a pesticide satisfies certain requirements, including the requirement that its use will not cause "unreasonably adverse effects on the environment." 7 U.S.C. § 136a(c)(5). If section 136a(c)(5)'s requirements are not satisfied, the EPA may deny an application to register a pesticide. Id. § 136a(c)(6). Alternatively, the EPA may classify the pesticide for restricted use by imposing conditions related to its labeling and/or application. Id. § 136a(d).

The EPA is obligated to periodically review the registration of each pesticide. Id. § 136a(g). Additionally, as to "each registered pesticide containing any active ingredient contained in any pesticide first registered before November 1, 1984," FIFRA imposes upon the EPA a duty to reregister those pesticides to determine whether they meet the requirements of section 136a(c)(5). Id. § 136a-1. Upon review or reregistration, the EPA

has the authority to cancel or change the classification of a registration.  Id. §§ 136d, 136a-1(g)(2)(D).  In certain circumstances, the EPA may also immediately suspend a registered pesticide pending cancellation or change in classification proceedings.  Id.

### 2. The Endangered Species Act

Registration or reregistration of a pesticide under FIFRA constitutes federal agency action subject to the interagency consultation requirements of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.  Wash. Toxics Coal. v. EPA, 413 F.3d 1024, 1032 (9th Cir. 2005).  The ESA was enacted for the conservation of endangered and threatened species.  Id. § 1531(b).  The Secretary of Commerce and the Secretary of the Interior (collectively, the "Secretary") share responsibility for implementing the ESA.  The Secretary of Commerce is responsible for listed marine species and administers the ESA through the National Marine Fisheries Service ("NMFS").  The Secretary of the Interior is responsible for listed terrestrial and inland fish species and administers the ESA through the FWS (together with NMFS, the "Service").  Id. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

Section 7(a)(2) of the ESA provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical[.]"  16 U.S.C. § 1536(a)(2).  After initiating consultation, "the Federal agency . . . shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [Section 7(a)(2)]."  Id. § 1536(d).

The ESA's implementing regulations lay out the consultation process.  Subject to exceptions not relevant here, an agency must initiate formal consultation with the Service if it determines that a proposed action "may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  The Service must then prepare a biological opinion, determining whether the action is "likely to jeopardize the continued existence of listed species or result

in the destruction or adverse modification of critical habitat." Id. § 402.14(g).  If the biological opinion concludes that jeopardy is likely, it must also include "reasonable and prudent alternatives, if any" to the proposed action. Id. § 402.14(h).  "Formal consultation is terminated with the issuance of the biological opinion." Id. § 402.14(m).[1]

Consultation "shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency."  16 U.S.C. § 1536(b)(1)(A).  Subparagraph (B) limits the discretion of the Secretary and the Federal agency to extend the consultation period for actions involving a permit or license applicant. Id. § 1536(b)(1)(B).  If consultation will extend beyond 90 days, the applicant must be provided a written statement setting forth the reasons for the extension, the information required to complete the consultation, and the estimated date of completion. Id.  If consultation will extend 150 days or more, the applicant's consent is also required. Id.  The Service and the Federal agency may agree to further extensions, with the applicant's consent. Id.

### B.   FACTUAL BACKGROUND

According to Plaintiffs, the EPA and the Service have long failed to comply with the ESA's consultation requirement when registering pesticides under FIFRA.  Second Am. & Suppl. Compl. ("SAC") ¶ 48, Dkt. 43.  In 2011, to address this deficiency, the EPA and the Service requested that the National Academy of Sciences convene a committee of independent experts to identify best practices for assessing the effects of pesticides on listed species. Id.  The National Academy of Sciences issued a report in 2013, and the EPA and the Service held five interagency workshops between August 2013 and September 2016 to further refine their approach. Id. ¶¶ 49-50.  During the workshops, the EPA and the Service discussed the types of information that would be needed to complete consultations,

---

[1] The ESA's implementing regulations also provide for informal consultation, an optional process designed to assist the Federal agency in determining whether formal consultation is required.  50 C.F.R. § 402.13.  If, as a result of informal consultation, the Federal agency determines, with the written concurrence of the Service, that the proposed action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary. Id. §§ 402.13(a), 402.14(b)(1).

including the available pesticide usage data. Id. The EPA and the Service also gave technical presentations to and held workshops with outside stakeholders. Id. ¶¶ 51-52.

Ultimately, the EPA and the Service opted to address their ESA obligations for pesticide registrations "by conducting nationwide scale effects determinations," rather than focus on subsets of species in smaller geographic areas. Id. ¶ 53. They agreed to complete the first nationwide consultations on pesticide products that contain malathion, chlorpyrifos, and diazinon. Id.

In 2014, the EPA began preparing a biological evaluation to assess the effects of 96 actively-registered pesticide products containing malathion. Id. ¶ 54. In April 2016, it provided a draft biological evaluation for public comment. Id. ¶ 55 (citing 81 Fed. Reg. 21341 (Apr. 11, 2016)). On January 18, 2017, the EPA transmitted its final biological evaluation to the Service to initiate formal consultation. Id. ¶ 61. The EPA determined that authorized uses of malathion are likely to adversely affect 1,778 listed species and 784 critical habitats. Id. Although its effects analysis was based on authorized uses of pesticide products, estimated actual uses were also included. Id. ¶¶ 56, 61.

Initially, the EPA and the Service had agreed to provide a draft biological opinion for public comment in May 2017 and to issue a final biological opinion on pesticide products containing malathion by December 2017. Id. ¶ 62. In April 2017, however, CropLife and other industry stakeholders requested that the EPA withdraw its biological evaluation and that the Service stop work on its biological opinion. Id. ¶ 63. Thereafter, the Service did not provide a draft biological opinion for public comment, either in May 2017 (as initially planned) or any time thereafter. Id. ¶ 64.

In or about October 2017, the FWS completed a draft biological opinion. Id. ¶ 65. It determined that authorized uses of malathion are likely to adversely affect 1,771 listed species and 734 critical habitats. Id. ¶¶ 66, 89. It also identified reasonable and prudent alternatives to avoid jeopardy. Id. ¶ 67. In November 2017, however, the FWS sought an indefinite extension of the consultation. Id. ¶ 70. The stated reason for the extension was to conduct a "revised effects analysis" that reflects "actual use" of pesticide products. Id.

The FWS requested additional data from the EPA on actual use, including extrapolation where data does not exist or cannot be obtained. Id.  The EPA consented to an extension and stated that it would take approximately six months to provide additional data. Id. ¶ 71. Consequently, the FWS did not issue a final biological opinion on the nationwide effects of pesticide products containing malathion, either by December 2017 (as initially planned) or any time thereafter. Id. ¶ 73.[2]

In January 2018, the EPA and the Service entered a Memorandum of Agreement establishing an interagency working group that, according to Plaintiffs, "appears to scrap years of previous discussions, analyses, decisions, and commitments concerning compliance with the ESA for pesticide registration actions." Id. ¶ 75.  In March 2018, the EPA summarized all available usage data for pesticides containing malathion. Id. ¶ 76.  It determined that "usage data at smaller levels may not be statistically valid due to reduced sample size," and thus, the data may underestimate the maximum yearly usage. Id. Nevertheless, the EPA estimated that, from 2011 to 2015, an average of 1 million pounds of malathion were used on agricultural sites and 1.7 million pounds were used on non-agricultural sites (e.g., mosquito control) each year. Id.

In October 2018, the FWS requested that the EPA consent to extend the consultation period for malathion such that a draft biological opinion will issue in April 2020 and a final biological opinion will issue in March 2021. Id. ¶ 77.  The FWS stated that "additional time is required to review the available use and usage data, assess whether it can be further refined at a more granular scale, and incorporate such data in our effects analysis." Id. According to the FWS, these efforts will more accurately reflect "those effects that are reasonably certain to occur to ESA-listed species and critical habitat as a result of re-registering malathion." Id.  The EPA consented to the extension, id. ¶ 78, as did the technical registrants of malathion, id. ¶ 79.

---

[2] NMFS transmitted its final biological opinion to the EPA on December 29, 2017. SAC ¶ 74.  NMFS analyzed 77 listed species and 50 critical habitats within its jurisdiction and concluded that authorized uses of pesticide products containing malathion are likely to adversely affect 38 listed species and 37 critical habitats. Id.

### C. PROCEDURAL HISTORY

Plaintiffs are non-profit organizations dedicated to the protection of endangered species from extinction and the protection of public and environmental health from toxic chemicals. SAC ¶¶ 19-21. Plaintiffs initiated the instant action on May 30, 2018, Dkt. 1, and filed a First Amended Complaint for Declaratory and Injunctive Relief on July 25, 2018, Dkt. 18. Shortly thereafter, CropLife filed an unopposed motion to intervene as defendant, Dkt. 19, which the Court granted, Dkt. 29.[3]

Following extensions of the deadline to respond, Defendants moved to dismiss the First Amended Complaint. Dkt. 38. In response, Plaintiffs filed a motion for leave to file second amended and supplemental complaint. Dkt. 40. The court granted Plaintiffs' motion to file an amended complaint and denied Defendants' motion as moot. Dkt. 42.

Thereafter, Plaintiffs filed the operative Second Amended and Supplemental Complaint for Declaratory and Injunctive Relief. Dkt. 43. The SAC advances three causes of action for: (1) violations of Section 7(a)(2) of the ESA; (2) violations of Section 706(1) & (2) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.; and (3) violations of Section 7(d) of the ESA.

Following several more extensions of the deadline to respond, Defendants filed the instant Motion to Dismiss Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6). Dkt. 51 ("Mot."). Intervenor-Defendant filed a Joinder in Defendants' Motion to Dismiss, Dkt. 52 ("Joinder"); Plaintiffs filed a Combined Response to Defendants' Motion to Dismiss and Intervenor's Joinder, Dkt. 54 ("Opp'n); and Defendants and Intervenor-Defendant filed separate replies, Dkt. 56 ("Defs.' Reply"), Dkt. 57 ("Intrv.'s Reply"). The motion is fully briefed.

---

[3] CropLife is a not-for-profit trade association organized to represent the common interests of major manufacturers, formulators, and distributors of crop protection and pest control products. Lattimore Decl. ISO Mot. to Intervene ¶ 2, Dkt. 19-2. CropLife member companies produce, sell, and distribute most of the active ingredients used in crop protection products registered for use in the United States, including malathion. Id.

## II.     LEGAL STANDARD

A complaint may be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. "An attack on subject matter jurisdiction may be facial or factual." Edison v. United States, 822 F.3d 510, 517 (9th Cir. 2016). "In a facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." Id. (citation omitted). "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014).

Rule 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the complaint pleads factual content that allows the court to draw the "reasonable inference" that the defendant committed the alleged violations. Id. (citing Twombly, 550 U.S. at 556).

## III.    DISCUSSION

Defendants move to dismiss the Second Amended Complaint in its entirety on the ground that Plaintiffs lack organizational standing and move to dismiss the First and Second Claims for Relief, individually, on other grounds. Intervenor-Defendant raises additional arguments in support of the motion and independently seeks dismissal of the Third Claim for Relief. The Court addresses these matters, in turn.

### A. STANDING

Defendants challenge Plaintiffs' standing to prosecute this action, either on behalf of their members or on behalf of the organizations themselves.[4] An organization can assert standing to bring suit on behalf of its members when: (1) at least one of its members would have standing to sue in his or her own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc., 528 U.S. 167, 181 (2000). Here, the matter in dispute is whether at least one of Plaintiffs' members would have standing to sue in his or her own right.

Article III's "irreducible constitutional minimum of standing" consists of three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. (internal quotation marks and citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Id. (internal quotation marks, alterations, and citation omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (internal quotation marks and citation omitted). Defendants challenge the first and third elements.

#### 1. Injury in Fact

Generally, an environmental group has standing to bring claims under the ESA where its members regularly use and enjoy an area inhabited by the imperiled species. W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 484 (9th Cir. 2011). Here, Defendants argue that Plaintiffs fail to allege facts "demonstrating their interest in any particular

---

[4] Because, as discussed below, the Court finds that Plaintiffs have standing to sue on behalf of their members, it need not reach the issue of whether the organizations also have standing to sue on their own behalf.

species or geographical area *affected by any particular pesticide product*." Mot. at 7 (emphasis added).  They do not challenge Plaintiffs' allegations regarding their members' interests in geographic areas that are home to listed species.  Rather, Defendants argue that Plaintiffs fail to specify which of the pesticide products at issue are used in the areas where Plaintiffs' members have demonstrated an interest.  Defendants cite no authority requiring that level of specificity, however, and the Court finds none.  To the contrary, other courts have found allegations similar to those alleged here sufficient to establish standing.  See Ctr. for Biological Diversity v. EPA, 316 F. Supp. 3d 1156, 1164-65 (N.D. Cal. 2018); Ellis v. Housenger, 252 F. Supp. 3d 800, 817-19 (N.D. Cal. 2017).

Plaintiffs allege that their members regularly visit areas impacted by the pesticide products at issue and that they derive recreational, aesthetic, and other benefits from listed species that may be adversely affected by those pesticide.  SAC ¶ 22 & Ex. A, App. C.  For example, one or more of Plaintiffs' members regularly visit the Willamette Valley in Oregon and derive recreational, aesthetic, and other benefits from the endangered Fender's blue butterfly.  Id. ¶ 23.  Plaintiffs further allege that one or more of the pesticide products at issue are authorized for use on many of the crops grown in the Willamette Valley (e.g., grapes, berries, tree fruits, nuts, wheat, oats, and hops).  Id. ¶¶ 23, 84, 87.[5]  The pesticides "can be used wherever these crops are grown."  Id. ¶ 87.

At this stage of the proceedings, Plaintiffs' allegations are sufficient to demonstrate injury in fact.  See Ctr. for Biological Diversity, 316 F. Supp. 3d at 1164-65 (finding allegations of members' interests in species that may be affected by pesticide products sufficient to establish standing on motion to dismiss and rejecting the argument that separate allegations were required tying each pesticide product to harm to a particular species in a particular area affecting plaintiffs' members); Ellis, 252 F. Supp. at 817-819 (finding that plaintiffs established standing on cross-motions for summary judgment where they offered evidence that "the types of crops and plants for which [the pesticides] have

---

[5] Intervenor-Defendant admits that malathion products are registered for use on various crops in the Willamette Valley.  Intrv.'s Ans. to First. Am. Compl. ¶ 21, Dkt. 32.

been approved for use, e.g., corn and lawns, are located in or near the vicinity of the locales" in which their members viewed listed species).

### 2. Redressability

Defendants next contend that Plaintiffs fail to show redressability. They argue that the "requested relief—that the Court vacate the registration of products containing malathion, or order interim mitigation measures, until consultation is completed and [the] EPA implements any necessary alternatives or measures to comply with the ESA—will not redress [Plaintiffs'] alleged injury." Mot. at 8. In brief, Defendants note that, for most of the malathion products at issue, the original registration occurred decades ago (rendering any challenge thereto untimely) and the challenged action is a reregistration.[6] According to Defendants, vacating a reregistration would have no impact on the original registration; rather, the matter would be remanded for a new reregistration decision, during which time the original registration would remain in place. Defendants thus argue that "an order in the form requested by Plaintiffs will not redress the broad injury they assert." Id. at 9.

As a threshold matter, Defendants' redressability analysis is incomplete. The form of relief discussed by Defendants—i.e., vacating registrations and reregistrations—is but one form of relief requested in the complaint. Plaintiffs also request other declaratory and injunctive relief, including, but not limited to, an order requiring Defendants to complete consultation on the effects of pesticide products containing malathion (including those products at issue in this action) and implement any actions required to avoid jeopardy to listed species and/or destruction of critical habitats. These other forms of relief, which Defendants do not discuss, undoubtedly could redress Plaintiffs' alleged injury.

Moreover, even as to vacatur, the premise of Defendants' argument is flawed. The fact that vacatur of a reregistration would reinstate the original registration means only that

---

[6] At issue in this action are twenty-one pesticide products containing malathion that were registered or reregistered by the EPA between June 2012 and July 2017. SAC ¶ 84 (Table 1). Three are new registrations and 18 are reregistrations. Id. The six-year statute of limitations on claims that an agency failed to comply with the ESA's procedural requirements prevents Plaintiffs from challenging earlier registrations and reregistrations. See Ctr. for Biological Diversity v. EPA, 847 F.3d 1075, 1087 (9th Cir. 2017).

vacatur alone cannot immediately halt the use of the pesticide. It does not mean that vacatur offers no effective relief, however, particularly where Plaintiffs allege procedural injuries. See Salmon Spawning & Recovery All. v. Gutierrez, 545 F.3d 1220, 1226 (9th Cir. 2008) ("Plaintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised, could protect their concrete interests.'"). Vacating a reregistration that was issued without the requisite consultation would have the effect of requiring Defendants to consider the reregistration anew *after* conducting the consultation. It cannot reasonably be disputed that the EPA's reregistration decisions could be influenced by consultation. See Citizens for Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 976 (9th Cir. 2003) (holding that, had the USDA complied with the consultation requirement, it "could have influenced" the decision to take the challenged action).[7]

Accordingly, Plaintiffs' have alleged sufficient facts to establish standing.

### B. APA CLAIM

Plaintiffs allege violations of the APA on two alternative bases: (1) Defendants' decision to extend the consultation period through March 2021 is arbitrary, capricious, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2); and (2) Defendants have unlawfully withheld or unreasonably delayed the consultation on pesticide products containing malathion, in violation of 5 U.S.C. § 706(1).

#### 1. The Extension Decision

As stated above, Plaintiffs allege that Defendants' decision to extend the consultation period is arbitrary, capricious, or otherwise not in accordance with the law. Defendants argue that Plaintiffs fail to state a claim under Section 706(2) of the APA because the decision to extend the consultation period is not a final agency action.

---

[7] In a footnote, Defendants further argue that "even if the Court could grant the relief sought as to the 21 products in the Complaint, other products not challenged in the Complaint remain available for use." Mot. at 9 n.5. Relief need not eliminate all harm, however; redressability is shown where the relief sought is capable of reducing the alleged harm. See Massachusetts v. EPA, 549 U.S. 497, 525 (2007) (holding that, although a reduction in domestic motor-vehicle emissions would not itself "reverse global warming," redressability was shown where the relief sought would "slow or reduce it").

"[T]he APA provides a right to judicial review of any 'final agency action for which there is no other adequate remedy in a court.'" Navajo Nation v. U.S. Dep't of Interior, 819 F.3d 1084, 1090 (9th Cir. 2016) (quoting 5 U.S.C. § 704)). This finality requirement is jurisdictional. Ukiah Valley Med. Ctr. v. FTC, 911 F.2d 261, 266 (9th Cir. 1990); accord Havasupai Tribe v. Provencio, 906 F.3d 1155, 1161 (9th Cir. 2018). For agency action to be final, two conditions must be satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997)). These conditions are not satisfied here.

Plaintiffs provide no authority, and the Court finds none, to support the proposition that an agency's extension of its decision-making process itself constitutes final agency action. Plaintiffs argue that the decision to extend the consultation period is definitive on the issue of when consultation will conclude. "However, the fact that a statement may be definitive on some issue is insufficient to create a final action subject to judicial review." Indus. Customers of Nw. Utilities v. Bonneville Power Admin., 408 F.3d 638, 646-47 (9th Cir. 2005); see also Padilla v. U.S. Immig. & Customs Enf't, 354 F. Supp. 3d 1218, 1227-28 (finding that, although a credible fear interview is a process by which rights are determined and from which legal consequences flow, the matter of "[w]hen the interview is held does not mark the culmination of any decision-making process" (emphasis added)). Indeed, the decision to extend the consultation period is predicated on Defendants' assessment that additional data is required. The extension is thus intertwined with the consultation itself and does not mark the consummation of the decision-making process.

Furthermore, the issuance of a biological opinion following consultation constitutes a final agency action because it has "direct and appreciable legal consequences." Bennett, 520 U.S. at 154. The same cannot be said of the extension of the consultation period. Plaintiffs argue that an extension delays implementation of any protections that may be afforded to listed species at its conclusion. Assuming that consultation will result in such

protections, an extension does indeed delay the same. Practical consequences are not legal consequences, however, see Indus. Customers of Nw. Utilities, 408 F.3d at 647 (acknowledging that, "[i]n the real world," interlocutory decisions may have "profound consequences," yet remain immune from judicial review), and delay does not "transform an interlocutory decision into final agency action," Navajo Nation, 819 F.3d at 1092.

Plaintiffs also argue that legal consequences flow from the extension because the EPA is "not subject to the 'coercive effect' of a final Biological Opinion during the years of delay," thereby allowing it to continue registering and reregistering pesticide products containing malathion without implementing measures to protect listed species. Opp'n at 23. The fact that an agency—by extending its decision-making process—explicitly does not determine rights or obligations cannot be flipped on its head to transform the action into one from which such consequences flow. Although the EPA may be violating the ESA by registering and reregistering pesticides without the requisite consultation, those violations are separately actionable under the ESA (and, in fact, Plaintiffs bring such claims in their First and Third Claims for Relief). An ongoing violation of a statutory duty does not itself transform Defendants' decision to extend the consultation period into final agency action.

Nevertheless, Plaintiffs allege two *alternative* bases for their APA claim. Because, as discussed below, Plaintiffs successfully state a claim of unreasonable delay, the Second Claim for Relief survives dismissal.

### 2. Delay in Completing the Consultation

The APA permits suit to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); see also ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1137 (9th Cir. 1998) (review of an agency's failure to act under Section 706(1) is an "exception to the final agency action requirement"). A claim under Section 706(1) can proceed only where a plaintiff alleges that an agency withheld or delayed "a *discrete* agency action that it is *required to take*." Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphasis in original). Here, it is alleged that Defendants have delayed completion of the consultation required by Section 7(a)(2) of the ESA.

Defendants argue that the APA claim must be dismissed as to the EPA because it merely "consented" to the FWS's request to extend the consultation period. Mot. at 14. Defendants assert that "having consented, [the] EPA has not unlawfully withheld or unreasonably delayed any action." Id. The Court disagrees. Section 7(b)(2) of the ESA provides that the consultation period may be extended "as is *mutually agreeable* to the Secretary and the Federal agency." 16 U.S.C. § 1536(b)((1)(A) (emphasis added); see also 50 C.F.R. § 402.14(f) (providing that, "[i]f no extension of formal consultation is agreed to," the Service "will issue a biological opinion using the best scientific and commercial data available"). Thus, the authority to extend the consultation period rests with *both* the FWS and the EPA. Moreover, Plaintiffs' unreasonable delay claim is not predicated upon Defendants' act of extending the consultation period, but rather, on their *failure* to complete the requisite consultation. That obligation is mandatory and undeniably rests with both the EPA and the FWS. See 16 U.S.C. § 1536(a)(2) (providing that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary," insure that agency action is not likely to jeopardize listed species and/or critical habitat); Bennett, 520 U.S. at 175 ("any contention that the relevant provision of 16 U.S.C. § 1536(a)(2) is discretionary would fly in the face of its text, which uses the imperative 'shall'").[8]

Defendants' other arguments fare no better. Defendants assert that, in "evaluating whether agency action has been unreasonably delayed, courts look to whether the statute sets a timeframe or a time limit." Mot. at 12. Defendants note that Section 7(b)(1) of the ESA establishes a timeframe for consultation (i.e., 90 days) but emphasize that the statute allows for extensions. Id. According to Defendants, because they complied with the ESA's procedural requirements in extending the consultation period, "the extension cannot

---

[8] Intervenor-Defendant notes that, where an applicant is involved, the ESA provides that the FWS and the EPA may not extend the consultation deadline without the applicant's consent. According to Intervenor-Defendant, "[i]t follows that the applicant's consent essentially obligates FWS and EPA to continue their consultation into the extended time period." Joinder at 3. This argument is specious. The ESA provides a timeframe for consultation and provides that an applicant's consent is required to extend the consultation beyond that timeframe. 16 U.S.C. § 1536(b)(1). *Nothing* in the ESA limits the EPA and the FWS's discretion to conclude a consultation.

Case 4:18-cv-03197-SBA   Document 62   Filed 09/30/19   Page 16 of 20

form the basis of a claim under Section 706(1)." Id. at 14.  Plaintiffs succinctly and persuasively respond to this argument: "The fact that the ESA allows for extension of the consultation timeline does not mean that any and all delay is reasonable."  Opp'n at 19.

Claims of unreasonable delay are evaluated under the so-called TRAC factor test. Brower v. Evans, 257 F.3d 1058, 1068-69 (9th Cir. 2001) (citing Telecomm. Research & Action v. FCC (TRAC), 750 F.2d 70, 80 (D.C. Cir. 1984)).  The factors to be balanced are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

Id. (quoting Indep. Mining Co., 105 F.3d at 507 n.7 (quoting TRAC, 750 F.2d at 80) (quotation marks, citations, and alterations omitted)).  "The most important factor is the first factor, the 'rule of reason,' though it, like the others, is not itself determinative."  In re A Cmty. Voice, 878 F.3d 779, 786 (9th Cir. 2017).  Courts must "consider them all."  Id. Thus, although a statutory timetable is a consideration, it is but one of the factors that the Court must weigh.  Defendants do not meaningfully address the other factors.  By their logic, delay in completing consultation can never be unreasonable, regardless of its length, the reasons for it, or the nature and extent of the interests prejudiced thereby, simply because the ESA allows for extensions.  To so hold would be to sanction the perpetual delay of governmental obligations that are clearly mandated by law.

Finally, citing their duty to use the best available scientific and commercial data, Defendants summarily assert that extension of the consultation period is reasonable because the FWS determined that additional data should be gathered and evaluated.  A dispute as to whether delay is reasonable, based on the particular facts presented, is the essence of an unreasonable delay claim; it is a matter to be decided on the merits, not on a motion to dismiss.  The complaint sets forth well-pleaded facts challenging the reasonableness of

1 Defendants' decision to further delay consultation and postpone remedial action.  For
2 purposes of the instant motion, these allegations are sufficient.[9]

Accordingly, Defendants' motion is DENIED as to the Second Claim for Relief.

### C.   ESA SECTION 7(A)(2) CLAIM

Plaintiffs allege violations of Defendants' procedural and substantive duties under Section 7(a)(2) of the ESA.  Substantively, the ESA requires Defendants to ensure that agency action is not likely to jeopardize the continued existence of listed species.  Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir. 1985), abrogation on another ground recognized by Cottonwood Envtl. Law Center v. U.S. Forest Serv., 789 F.3d 1075, 1091 (9th Cir. 2015). Procedurally, the ESA requires that the EPA assess whether listed species are likely to be affected by agency action and, if so, to formally consult with the FWS.  Id.  The consultation process culminates in the issuance of a biological opinion by the FWS, wherein it makes a final jeopardy determination.  Id.

Defendants move to dismiss the Section 7(a)(2) claim on the ground that they "are complying with their procedural obligations" and, thus, "this aspect" of Plaintiffs' claim is moot.  Mot. at 15.  "Federal courts lack jurisdiction to consider 'moot questions . . . or to declare principles or rules of law which cannot affect the matter in issue in the case before

---

[9] Intervenor-Defendant contends that Plaintiffs lack standing to pursue their APA claim because they have not shown that the interest they seek to protect is "'arguably within the zone of interests to be protected or regulated by the statute . . . in question.'" Joinder at 4 (citing Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).  Intervenor-Defendant asserts that the claim is based upon the ESA provision governing extensions of the consultation period, which protects only applicants' interests in having consultation concluded swiftly.  Id.  This argument is misguided and unpersuasive. First, the zone of interest test "do[es] not require any 'indication of congressional purpose to benefit the would-be plaintiff.'"  Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012).  The fact that the ESA provisions in question do not explicitly protect Plaintiffs' interests therefore is not determinative.  Moreover, Plaintiffs seek to compel consultation, not in accordance with the specific requirements of Section 7(b)(1) of the ESA, but according to the APA's general mandate that agencies act "within a reasonable time."  See SAC ¶ 109 (citing 5 U.S.C. § 555(b)).  The substantive provision of the ESA that "serve[s] as the gravamen of the [claim]" is not Section 7(b)(1)'s timing guidelines, but Section 7(a)(2)'s consultation requirement.  Bennett, 520 U.S. at 175. It cannot reasonably be disputed that Plaintiffs' alleged interests are within the zone of interests protected by the consultation requirement.  See Salmon Spawning, 545 F.3d at 1230 (holding that conservation groups' interest in the protection of listed species is within the zone of interests to be protected by the consultation requirement).

1 it.'" Forest Guardians v. Johanns, 450 F.3d 455, 461 (9th Cir. 2006) (citations omitted).

2 "An action is moot 'if it has lost its character as a present, live controversy.'" Id. "The

3 basic question in determining mootness is whether there is a present controversy as to

4 which effective relief can be granted." Feldman v. Bomar, 518 F.3d 637, 642 (9th Cir.

5 2008). The party asserting mootness bears the "heavy" burden of establishing that no such

6 relief can be provided. Id.; Forest Guardians, 450 F.3d at 461 ("a case is not moot where

7 *any* effective relief may be granted" (emphasis in original)).

8       Dismissal on the ground of mootness is unwarranted for three reasons.[10] First, as

9 discussed in further detail below, Defendants' assertion that their procedural duties under

10 Section 7(a)(2) are satisfied is inaccurate. The Court may thus provide effective relief in

11 the form of an order requiring them to satisfy those duties by a date certain. Second, even

12 if all procedural violations had ceased, the Court may provide relief to remedy "continuing

13 harm" that may have resulted therefrom. Feldman, 518 F.3d at 643. Third, even if the case

14 were moot with respect to injunctive relief, the Court may still provide effective declaratory

15 relief. Id. at 642; see Forest Guardians, 450 F.3d at 462-63 (holding that the action was not

16 moot, even where the defendants had initiated consultation under Section 7(a)(2), where

17 declaratory relief would prohibit them from continuing to violate the law).

18       Defendants argue that an order directing them to comply with their procedural duties

19 would provide no effective relief because they have already undertaken to satisfy those

20 obligations. Pointing to the ESA's implementing regulations, Defendants assert that the

21 EPA has fully satisfied its procedural obligations, i.e., to determine whether the action in

22 question may affect listed species and, if so, to initiate consultation. The ESA does not

---

[10] As a threshold matter, Plaintiffs' Section 7(a)(2) claim alleges violations of Defendants' procedural *and* substantive duties. As Defendants acknowledge, they do not move to dismiss the claim insofar as it alleges violations of their substantive duties. See Defs.' Reply at 5 n.3. The Court is disinclined to dismiss *a part* of a cause of action, particularly where it fails to dispose of any avenue for relief. In any event, as discussed above, Defendants fail to demonstrate mootness, even as to their procedural duties.

simply require the EPA to *initiate* consultation, however, but rather, *to consult* with FWS.[11] Until the consultation process is concluded, that obligation continues.  Defendants further assert that "FWS currently is engaged in completing its procedural duties."  Mot. at 15.  However, its ultimate obligation is to issue a biological opinion, which it has not done (and does not plan to do, until, at the earliest, March 2021).  The fact that Defendants are in the process of complying with their procedural duties does not moot Plaintiffs' claim.

Indeed, the authority upon which Defendants rely is easily distinguished on this basis.  In Southern Utah Wilderness Alliance v. Smith, it was alleged that the defendants violated Section 7(a)(2) of the ESA by failing to consult with the FWS prior to taking certain action.  110 F.3d 724, 725, 726 (10th Cir. 1997).  The plaintiffs sought a declaration that the defendants violated Section 7(a)(2) and an injunction requiring the agency to consult with the FWS.  Id. at 727.  During the pendency of the action, the defendants *initiated and completed* an informal consultation and concluded that the action in question was *not likely to adversely affect listed species*.  Id.  The claim for injunctive relief was therefore moot because the requisite consultation had already taken place and, given the finding of no adverse affect, there could be no continuing harm as a result of the delay.  Id. at 727-29.  The claim for declaratory relief was likewise moot because there was no "continuing violation or practice" at issue and no showing that the defendants were likely to violate the ESA in the near future.  Id. at 730.

Here, in contrast, consultation has *not* been completed, registration and reregistration of pesticide products containing malathion have been ongoing absent the requisite consultation, and there has been no finding that such action is not likely to adversely affect listed species.  To the contrary, the EPA has determined that registration and reregistration of these pesticide products *is likely* to adversely affect listed species, thereby requiring formal consultation.  The challenged government conduct "has not evaporated or

---

[11] For example, the EPA has a duty to provide additional scientific and commercial data that may be necessary to complete the consultation, see 50 C.F.R. § 402.14(f), and the FWS has requested such information in this case.

- 19 -

disappeared," and Plaintiffs' interest in compelling Defendants' compliance—i.e., to ensure that registrations will not result in jeopardy to listed species—has not yet been satisfied. Feldman, 518 F.3d at 642. Thus, effective relief may well be granted, including, but not limited to, a) an order requiring Defendants to complete the consultation by a date certain, b) an order imposing interim measures or mitigating any harm that may have resulted from the delay, and/or c) a declaration that Defendants are violating Section 7(a)(2) of the ESA.

Accordingly, Defendants' motion is DENIED as to the First Claim for Relief.

### D.   ESA SECTION 7(D) CLAIM

Plaintiffs also allege violations of the EPA's duties under Section 7(d) of the ESA. Although Defendants do not move to dismiss this claim, Intervenor-Defendant argues that it should be dismissed for failure to state a claim. As rightly asserted by Plaintiffs, this matter is not properly before the Court. Insofar as Intervenor-Defendant seeks affirmative relief not sought in Defendants' motion, it failed to comply with the notice requirements. See Civ. L.R. 7-2. It also failed to comply with the Court's meet and confer requirement. Opp'n at 25; see Civil Standing Order No. 4 (providing that the Court may disregard and/or strike any papers filed without the requisite meet and confer). Intervenor-Defendant does not address these deficiencies. Although, as Intervenor-Defendant asserts, it is "not restricted to merely echoing the Government's arguments," Intrv.'s Reply at 1 n.1, it must nonetheless comply with the foregoing requirements.

Accordingly, Intervenor-Defendant's request that the Court dismiss the Third Claim for Relief will not be considered at this juncture.

### IV.   CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Defendants' Motion to Dismiss Second Amended Complaint, Dkt. 51, is DENIED.

IT IS SO ORDERED.

Dated: September 30, 2019

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
Senior United States District Judge